ATTORNEY FOR PETITIONERS:
**GEROLD L. STOUT**
STOUT LAW FIRM
Lowell, IN

ATTORNEYS FOR RESPONDENT:
**MARILYN S. MEIGHEN**
ATTORNEY AT LAW
Carmel, IN

**BRIAN A. CUSIMANO**
ATTORNEY AT LAW
Indianapolis, IN

**AYN K. ENGLE**
ATTORNEY AT LAW
Indianapolis, IN



FILED

Jul 24 2024, 3:32 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| DR. TULSI AND KAMINI SAWLANI, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Case No. 21T-TA-00044 |
| ) | |
| LAKE COUNTY ASSESSOR, ) | |
| ) | |
| Respondent. ) | |

### ON APPEAL FROM A FINAL DETERMINATION OF
### THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**July 24, 2024**

MCADAM, J.

This case presents a question of first impression. The Indiana Constitution limits a taxpayer's property tax liability to 1%, 2%, or 3% of the property's gross assessed value depending on the type of property. IND. CONST. art. 10, § 1(f). These limits, commonly referred to as "tax caps" or "circuit breakers," are implemented by statute.

*See* IND. CODE § 6-1.1-20.6-7.5(a) (2024). The Constitution requires the one percent cap to be applied to all "[t]angible property, including curtilage, used as a principal place of residence by an . . . owner of the property[.]" *See* IND. CONST. art. 10, § 1(c)(4), (f)(1). The homeowners in this case challenge the constitutionality of a provision of the statutory tax caps that limits the application of the one percent cap to the one acre of land surrounding their home. They contend that the constitutional one percent cap does not permit a one-acre limitation like the one imposed by statute and assert that they were entitled to the one percent cap for the additional 2.981 acres of land adjoining their home during the 2019 tax year. After careful review, the Court concludes that the Constitution does not permit a fixed one-acre limitation on the amount of land eligible for the one percent tax cap. The Court reverses the final determination of the Indiana Board of Tax Review (the "Indiana Board") and remands the matter for further proceedings to determine whether the homeowners' contested acreage is entitled to the one-percent tax cap in light of this decision.

## FACTS AND PROCEDURAL HISTORY

Dr. Tulsi and Kamini Sawlani own a two-story home situated on 3.981 acres of land in Crown Point, Indiana. For the 2019 assessment, the home and the one acre of land surrounding it were classified as residential real property subject to the one percent tax cap. The other 2.981 acres of land were classified as nonresidential real property subject to the three percent tax cap.

Believing that the Indiana Constitution requires the one percent tax cap to also be applied to their additional 2.981 acres of land, the Sawlanis appealed their assessment first to the Lake County Property Tax Assessment Board of Appeals and

2

then to the Indiana Board. The Indiana Board rejected the Sawlanis' claims, concluding that it lacked the authority to resolve the constitutional question presented by the Sawlanis' appeal. The Sawlanis then initiated this original tax appeal.

## STANDARD OF REVIEW

The Court's review of Indiana Board decisions is governed by Indiana Code section 33-26-6-6, the provisions of which closely mirror those controlling judicial review of administrative decisions governed by Indiana's Administrative Orders and Procedures Act ("AOPA"). *Compare* IND. CODE § 33-26-6-6(e) (2024) *with* IND. CODE § 4-21.5-5-14(d) (2024). Under Indiana Code section 33-26-6-6, the party seeking to overturn a final determination of the Indiana Board bears the burden of demonstrating its invalidity. I.C. § 33-26-6-6(b). Accordingly, the challengers must demonstrate that they have been prejudiced by a final determination of the Indiana Board that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. I.C. § 33-26-6-6(e).

## DISCUSSION

In 2010, Indiana voters overwhelmingly approved an amendment to the Indiana Constitution limiting property tax liability for real and personal property. These limitations added language to Article 10, Section 1, capping the amount of property tax at 1%, 2%, or 3% of a property's gross assessed value, depending on the type of property. These tax caps impose strict limitations on the ability of the state to tax property, setting a ceiling on the amount of tax that can be levied (i.e., the 1%, 2%, and 3% tax caps) and

3

a floor on the types of property entitled to their benefit (i.e., the assignment of each type of property to a cap). These tax caps are not self-executing, however. Article 10 styles them as a mandate to the General Assembly, directing it to enact legislation effectuating the constitutional limitations. IND. CONST. art. 10, § 1(f) (requiring the legislature to establish the property tax caps "by law"). The current version of these statutory caps is set forth in Chapter 20.6 of the Indiana Code, which establishes a system of property tax credits equal to the amount that a taxpayer's property tax liability exceeds the 1%, 2%, or 3% limit. *See* IND. CODE §§ 6-1.1-20.6-0.3 to -13 (2024).

At issue in this case is the one percent cap on property used as a principal place of residence by its owner, specifically the difference between the constitutional mandate and the statutory language. The Constitution requires the one percent cap to be applied to all "[t]angible property, including curtilage, used as a principal place of residence by an . . . owner of the property[.]" IND. CONST. art. 10, § 1(c)(4), (f)(1). The statute, however, uses different words to describe the type of property eligible for the one percent cap. It applies the one percent cap to "homestead" property which, among other things, "consists of a dwelling and the real estate, not exceeding one (1) acre, that immediately surrounds that dwelling." *See* IND. CODE § 6-1.1-20.6-7.5(a)(1) (2019); IND. CODE § 6-1.1-12-37(a)(2) (2019) (amended 2024).

Seizing on the variation between the two articulations, the Sawlanis contend that the statute unconstitutionally limits the one percent cap by restricting its application to one acre of land surrounding a taxpayer's dwelling. They point to the fact that the Constitution does not use the term "homestead" and does not contain any explicit limitation based on acreage. The Assessor disagrees, arguing that the statutory one-

4

acre limitation flows from the term "curtilage" used in the constitutional definition and is consistent with the legislative history.

The question presented to the Court is whether the one-acre limitation restricting the one percent cap to the Sawlanis' house and the one acre of land surrounding it can be applied consistent with the constitutional mandate. If it cannot, the one-acre limitation in the statutory one percent cap must yield to the Constitution to the extent that the additional 2.981 acres of land otherwise satisfies the statutory requirements. The Sawlanis have not challenged any other aspect of the statutory scheme and have not asserted that, absent the one-acre limitation, the statute is inadequate to effectuate the constitutional mandate as applied to their additional 2.981 acres of land.

**Constitutionality of the Statutory One-Acre Limitation**

It is well-established that "all laws come before [the courts] clothed with the presumption of constitutionality[.]" *Holcomb v. Bray*, 187 N.E.3d 1268, 1277 (Ind. 2022) (quoting *Meredith v. Pence*, 984 N.E.2d 1213, 1218 (Ind. 2013)) (internal quotation marks omitted). The challenger seeking to overturn a statute on constitutional grounds carries a high burden to show the law is unconstitutional. *Id.* The courts must resolve any doubts against the challenger and in favor of finding the law constitutional. *Id.*

"Interpretation of the Indiana Constitution is controlled by the text itself, illuminated by history and by the purpose and structure of our constitution and the case law surrounding it." *State v. Katz*, 179 N.E.3d 431, 443 (Ind. 2022) (quoting *Price v. State*, 622 N.E.2d 954, 957 (Ind. 1993)) (internal quotation marks omitted). Courts look to the history surrounding the key constitutional text and "examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain

5

the old law, the mischief, and the remedy." *Horner v. Curry*, 125 N.E.3d 584, 600 (Ind. 2019) (quoting *Bayh v. Sonnenburg*, 573 N.E.2d 398, 412 (Ind. 1991)) (internal quotation marks omitted). Courts must approach the words of the Constitution with "particular deference, as though every word had been hammered into place." *Meredith*, 984 N.E.2d at 1218 (quoting *Embry v. O'Bannon*, 798 N.E.2d 157, 160 (Ind. 2003)) (internal quotation marks omitted).

## A. History of Indiana's Property Tax Caps

Before delving into the constitutional analysis, it is helpful to survey the history and development of the property tax caps, beginning with a review of the events precipitating their adoption and then proceeding through the period of adoption.

*A Paradigm Shift in Property Taxation: 1993 to 2002*

Though some commentators trace the origins of Indiana's modern property tax reform efforts, including the tax caps, to the "Bowen Tax Package" of 1973, the primary catalyst for the tax caps did not emerge until the 1990s with the seminal decision in the *Town of St. John* case.[1,2] *See, e.g.,* Cecil Bohanon, Dagney Faulk & Michael Hicks, *Property Tax Restructuring in Indiana: The Role of Tax Rate Variability*, Nat'l Tax Ass'n Proc. 101st Ann. Conf. on Tax'n 241-42 (Nat'l Tax Ass'n 2008); Craig L. Johnson & Justin M. Ross, *A Fiscal History of Indiana Local Government*, 11-13, Ind. Fiscal Pol'y Inst. (2018).[3] Initially filed in 1993, the *Town of St. John* case spanned more than five

---

[1] The "Bowen Tax Package" of 1973 refers to a set of tax reforms supported by then Indiana Governor Otis Bowen.

[2] For ease of reading, the Court has provided the full citations for documents and legislative materials available online in the footnotes.

[3] Cecil Bohanon, Dagney Faulk & Michael Hicks, *Property Tax Restructuring in Indiana: The*

6

years and generated six opinions between 1996 and 1998 by this Court and the Indiana Supreme Court. *See State Bd. of Tax Comm'rs v. Town of St. John* (*St. John VI*), 702 N.E.2d 1034, 1035-36 (Ind. 1998). *See also* Dagney Faulk, *How We Got Here from There: A Chronology of Indiana Property Tax Laws*, 79 Ind. Bus. Rev., at 2 (Summer 2004).[4] At that time, the cost schedules used to assess real property were not based on objectively verifiable data, resulting in non-uniform and unequal assessments. *See St. John VI*, 702 N.E.2d at 1042-43. Studies conducted around the time revealed that residential property was assessed at 62% of market value, commercial property at 81%, industrial property at 72%, and agricultural property at 54%. *Id.* at 1042.

Against that backdrop, the Indiana Supreme Court invalidated the state's assessment system under Article 10, Section 1 of Indiana's Constitution. *See id.* at 1037-43. It found the assessment system inconsistent with the constitutional guarantee of a uniform and equal rate of assessment and taxation, holding that assessments must be based on "objective measure[s] of property wealth[.]" *See id.* This Court responded by ordering the now-defunct State Board of Tax Commissioners to implement new constitutional assessment regulations by June 1, 2001, and to use these regulations for a general reassessment of all Indiana real property for the March 1, 2002, assessment

*Role of Tax Rate Variability*, Nat'l Tax Ass'n Proc. 101st Ann. Conf. on Tax'n 241-42 (Nat'l Tax Ass'n 2008), available at https://ntanet.org/wp-content/uploads/proceedings/2008/028-bohanon-property-tax-restructuring-2008-nta-proceedings.pdf (last visited July 19, 2024); Craig L. Johnson & Justin M. Ross, *A Fiscal History of Indiana Local Government*, 11-13, Ind. Fiscal Pol'y Inst. (2018), available at https://indianafiscalpolicyinstitute.wildapricot.org/resources/Documents/Fiscal%20History%20of%20Indiana%20Local%20Government%20-%20IFPI%202018.pdf (last visited July 19, 2024).

[4] Dagney Faulk, *How We Got Here from There: A Chronology of Indiana Property Tax Laws*, 79 Ind. Bus. Rev., at 2 (Summer 2004), available at https://www.ibrc.indiana.edu/ibr/2004/summer04/summer04_art1.html (last visited July 19, 2024).

date. *See Town of St. John v. State Bd. of Tax Comm'rs*, 729 N.E.2d 242, 251 (Ind. Tax Ct. 2000).

*The Town of St. John Era Begins: 2002 to 2007*

In the wake of the *Town of St. John* decisions, various changes were implemented to manage the evolving property assessment landscape and the anticipated shift in property tax burdens from businesses to homeowners. It was anticipated that "a move to a more objective measure of assessed value would inevitably shift [the] property tax burden from business entities to homeowners[,]" potentially increasing residential property tax bills by 31% to 39% and decreasing business property tax bills by 22% to 27%. Bohanon et al., *supra* at 242. As part of the effort to align the new assessment system with broader tax policy goals, the General Assembly adopted a proposal during the 2002 regular session to amend the Constitution to expressly permit the Legislature to exempt residential property and business inventory from property taxation. *See* Pub. L. No. 189-2002, 2002 Ind. Acts 2715, 2715-16; *see also* Bohanon et al., *supra* at 242. The amendment was approved again in 2003 and ratified in 2004 by the electorate with a margin of 71% to 29%. *See* Pub. L. No. 278-2003, 2003 Ind. Acts 2968, 2968-69; 2004 Hist. Election Results - Referendums, Ind. Sec'y State (2004).[5]

Following the conclusion of the 2002 regular session, Governor Frank O'Bannon called the Legislature back for a special session to address, among other things, the shifting property tax burden from businesses to homeowners. *See* H. Journal, 112th

---

[5] 2004 Hist. Election Results - Referendums, Ind. Sec'y State (2004), available at https://indianavoters.in.gov/ENRHistorical/ElectionResults?year=2004 (last visited July 19, 2024).

Gen. Assemb., 1st Spec. Sess. 1 (Ind. 2002).[6] Several additional measures were adopted during that special session to shield residential property owners from bearing a disproportionate share of the property tax burden, including additional funding for property tax relief financed by a one percent increase in the state sales tax, expanded authority for local income taxes to provide property tax relief, and an increase in the standard homestead deduction from $6,000 to $35,000. *See* Pub. L. No. 192-2002 (ss), §§ 32, 49, 121, 2002 Ind. Acts 2727, 2755-56, 2805-06, 2864-68; *see also* Faulk, *supra* at 2; Johnson & Ross, *supra* at 14. The measures were strategically timed to coincide with the general reassessment of properties in 2002, which would start impacting property tax bills in 2003. Johnson & Ross, *supra* at 14.

Nevertheless, "[s]ome taxpayers saw big tax hikes anyway[,]" particularly "[o]wners of older homes, owners of rental housing and owners of farmland[.]" Larry DeBoer, *What Do We Know About Indiana's Property Tax Caps?*, 4, Ind. Fiscal Pol'y Inst. (2015).[7] At the same time, business property taxes generally declined. *Id.* In response, the General Assembly continued to refine the property tax assessment system during the 2003 and 2004 legislative sessions. It established a four-year cycle for property tax assessments to begin in 2007 and directed the Department of Local Government Finance to create a system of annual adjustments starting in 2005 to capture incremental changes in the intervening years between reassessments

---

[6] H. Journal, 112th Gen. Assemb., 1st Spec. Sess. 1 (Ind. 2002), available at https://archive.iga.in.gov/special_session/2002/bills/combined_journals.pdf (last visited July 19, 2024).

[7] Larry DeBoer, *What Do We Know About Indiana's Property Tax Caps?*, 4, Ind. Fiscal Pol'y Inst. (2015), available at https://indianafiscalpolicyinstitute.wildapricot.org/resources/IFPI%20Property%20Tax%20Report%20FINAL.pdf (last visited July 19, 2024).

(commonly referred to as "trending"). *See* Pub. L. No. 245-2003, §§ 3-4, 2003 Ind. Acts 2433, 2435-36; Faulk, *supra* at 2. These annual adjustments were intended to stabilize property taxes over time and avoid sharp increases in property taxes every four years. *See* DeBoer, *supra* at 5.

Leading into 2007, several events combined to threaten a substantial increase in residential property taxes again. *Id.* The annual adjustments for property assessments mandated in 2003 took effect, a recession led the state to reduce the amount of property tax relief provided to local governments, an error in the application of the homestead credit reduced tax relief, and the elimination of the inventory tax further shifted the property tax burden to homeowners. *Id.*; Bohanon et al., *supra* at 243. Anticipating the pressure on property tax bills, the General Assembly passed various measures in 2006 in an attempt to dampen the expected tax increases. DeBoer, *supra* at 5*.* It raised several property tax deductions and credits and, for the first time on a statewide basis, introduced the concept of a circuit breaker or tax cap, although it never took effect. *See* Pub. L. No. 224-2007, §§ 3, 38, 2007 Ind. Acts 3870, 3870-71, 3919-21; DeBoer, *supra* at 5*.* The tax caps would have limited the amount of property taxes to 2% of assessed value for homesteads and 3% for all other property. *See* Pub. L. No. 224-2007, § 38.

Even so, the arrival of tax bills in 2007 brought large increases and several homeowners saw their property taxes increase substantially with the average home facing a 24% increase in property taxes. DeBoer, *supra* at 5; Bohanon et al., *supra* at 243; Comm'n on State Tax & Fin. Pol'y, *Final Report of the Commission on State Tax*

10

*and Financing Policy*, 12, Ind. Legis. Servs. Agency (2007).[8] This led to protests, including a taxpayer march on the state capital and even an Indianapolis Tea Party with protesters tossing a giant teabag in the Broad Ripple Canal. DeBoer, *supra* at 5; Bohanon et al., *supra* at 243. The General Assembly responded by charging the Commission on State Tax and Financing Policy with studying the property tax system and recommending potential solutions. Comm'n on State Tax & Fin. Pol'y, *supra* at 2. The Commission conducted a series of hearings on a wide range of topics in the summer and fall of 2007, including the repeal and potential replacement of the property tax, existing measures to control property taxes, limits imposed in other states, state assumption of local obligations, and additional controls on property taxes. *Id.* at 3-4.

In its November 2007 report, the Commission made forty-four recommendations, many of which were adopted in 2008, including a recommendation to "ensure tax relief is permanent with a constitutional amendment establishing a circuit breaker program[.]" *Id.* at 16-20 (capitalization omitted). Governor Mitch Daniels echoed the Commission's recommendation regarding a constitutional amendment two months later in his State of the State address, urging the General Assembly to adopt "permanent protection[s] against the return of unaffordable taxes, through a permanent, constitutional cap of one percent of a home's value, an absolute ceiling beyond which no homeowner would ever pass." *See* H. Journal, 115th Gen. Assemb., 2d Reg. Sess. 45 (Ind. 2008).[9]

---

[8] Comm'n on State Tax & Fin. Pol'y, *Final Report of the Commission on State Tax and Financing Policy*, 12, Ind. Legis. Servs. Agency (2007), available at https://archive.iga.in.gov/interim/2007/reports/STFPAB1.pdf (last visited July 19, 2024).

[9] H. Journal, 115th Gen. Assemb., 2d Reg. Sess. 45 (Ind. 2008), available at https://archive.iga.in.gov/2008/bills/2008%20Journals.PDF (last visited July 19, 2024).

*Adoption of the Tax Caps: 2008 to 2010*

The angst about property tax increases culminated in the eventual adoption in 2008 of a sweeping set of property tax reforms, which included many of the recommendations from the Commission on State Tax and Financing Policy and the proposal put forward by Governor Mitch Daniels. *See* DeBoer, *supra* at 5; Johnson & Ross, *supra* at 15. The response adopted by the General Assembly was far-reaching and multi-faceted. It shifted financial responsibility for various locally funded programs to the state, including elementary and secondary schools, child welfare, juvenile incarceration, state fair and forestry, indigent health care, and police and fire pensions. *See* Pub. L. No. 146-2008, 2008 Ind. Acts 2307, 2307; *see also* Johnson & Ross, *supra* at 15-16. It funded this increase in state spending by increasing the state sales tax from six to seven percent, redirecting gaming taxes, and eliminating property tax replacement credits. *See, e.g.,* Pub. L. No. 146-2008, §§ 18, 310, 2008 Ind. Acts 2307, 2330-35, 2620-21; *see also* Johnson & Ross, *supra* at 15-16. It expanded local income taxing authority for counties and eliminated 1,100 assessors primarily in townships, transferring their duties to the 92 county assessors. *See, e.g.*, Pub. L. No. 146-2008, §§ 693-698, 830-834, 2008 Ind. Acts 2307, 2924-28, 3094-98; *see also* Bohanon et al., *supra* at 244. It added a new 35% supplemental homestead deduction on top of the existing standard homestead deduction, increased the renter deduction by $500, and capped increases in tax bills for eligible low-income seniors at 2%. *See, e.g.*, Pub. L. No. 146-2008, §§ 116, 318, 2008 Ind. Acts 2307, 2415, 2627; *see also* Bohanon et al., *supra* at 244; DeBoer, *supra* at 5. It also required referenda for new school and other local government projects over a certain size. *See, e.g.*, Pub. L. No. 146-2008, §§ 193-

12

199, 2008 Ind. Acts 2307, 2515-26; *see also* Johnson & Ross, *supra* at 16. Finally, and most relevant to this case, it introduced new statewide property tax caps for all types of property. *See* Pub. L. No. 146-2008, §§ 222-223, 2008 Ind. Acts 2307, 2536-39; *see also* DeBoer, *supra* at 5.

The statutory caps were phased in over a two-year period. *See* Pub. L. No. 146-2008, §§ 222-223; *see also* DeBoer, *supra* at 5. In their first year, 2009, the caps were set at 1.5% for "homestead" property, 2.5% for agriculture and "non-homestead" residential property, and 3.5% for business property. *See* Pub. L. No. 146-2008, § 222; *see also* DeBoer, *supra* at 5. Then, beginning in 2010, the caps were tightened to 1%, 2%, and 3% respectively, which are the levels they remain at today. *See* Pub. L. No. 146-2008, § 223; *see also* DeBoer, *supra* at 5.

The General Assembly also began the process of amending Article 10, Section 1 of the Indiana Constitution. There were two competing joint resolutions proposed to add property tax caps to the Constitution – one by the Senate and one by the House. *Compare* H.J. Res. 1, 115th Gen. Assemb., 2d Reg. Sess. (Ind. 2008) *with* S. Journal, 115th Gen. Assemb., 2d Reg. Sess. 4 (Ind. 2007).[10] The Senate joint resolution, Senate Joint Resolution 1, ultimately prevailed, eventually reflecting the language found in the Constitution today:

> (f) This subsection applies to property taxes first due and payable in 2012 and thereafter. The General Assembly shall, by law, limit a taxpayer's property tax liability as follows:
>
> (1) A taxpayer's property tax liability on tangible property described in subsection (c)(4) may not exceed one percent (1%)

---

[10] H.J. Res. 1, 115th Gen. Assemb., 2d Reg. Sess. (Ind. 2008), available at https://archive.iga.in.gov/2008/bills/PDF/RES/HJ0001.2.pdf (last visited July 19, 2024); S. Journal, 115th Gen. Assemb., 2d Reg. Sess. 4 (Ind. 2007), available at https://archive.iga.in.gov/2008/bills/2008%20Journals.PDF (last visited July 19, 2024).

of the gross assessed value of the property that is the basis for the determination of property taxes.

(2) A taxpayer's property tax liability on other residential property may not exceed two percent (2%) of the gross assessed value of the property that is the basis for the determination of property taxes.

(3) A taxpayer's property tax liability on agricultural land may not exceed two percent (2%) of the gross assessed value of the land that is the basis for the determination of property taxes.

(4) A taxpayer's property tax liability on other real property may not exceed three percent (3%) of the gross assessed value of the property that is the basis for the determination of property taxes.

(5) A taxpayer's property tax liability on personal property (other than personal property that is tangible property described in (c)(4) or personal property that is other residential property) within a particular taxing district may not exceed three percent (3%) of the gross assessed value of the taxpayer's personal property that is the basis for the determination of property taxes within the taxing district.

*Compare* S.J. Res. 1, 115th Gen. Assemb., 2d Reg. Sess. (Ind. 2008) *with* IND. CONST. art. 10 § 1(f).[11] The House joint resolution, by contrast, closely mirrored the statutory one percent cap. *Compare* H.J. Res. 1 *with* Pub. L. No. 146-2008, §§ 115, 215, 223, 2008 Ind. Acts 2307, 2413-15, 2533, 2538-39. It specifically tied the one percent cap to the concept of a homestead and incorporated an explicit one-acre limitation:

(e) As used in this section, "homestead property" means real property improvements or a mobile or manufactured home that is owned (or is being purchased on contract) and used by an individual as the individual's principal residence. The term includes land on which the improvements or mobile or manufactured home is situated not exceeding one (1) acre. The term includes a principal residence that is owned by a trust in which the individual has a beneficial interest.

\* \* \* \* \*

---

[11] S.J. Res. 1, 115th Gen. Assemb., 2d Reg. Sess. (Ind. 2008), available at https://archive.iga.in.gov/2008/bills/PDF/RES/SJ0001.4.pdf (last visited July 19, 2024).

(h) The maximum amount of property tax on homestead property may not exceed one percent (1%) of the property's value as last assessed.

H.J. Res. 1. The House version was originally adopted by the House and offered to the Senate for consideration, but the Senate declined to take it up during the second half of the session. *See* Action List: H.J. Res. 1 of the 2008 Sess., 115th Gen. Assemb. Archives.[12] The House did not attempt to add the language from the House joint resolution to Senate Joint Resolution 1 when it was under consideration in the House. *Id.*

Two years later, during the 2010 legislative session, the proposed amendment, reflecting the 2008 Senate joint resolution, was offered and approved again. *See* Pub. L. No. 116-2010, 2010 Ind. Acts 1630, 1630-32. In conjunction with the passage of the amendment language itself, the Legislature adopted regular legislation framing the public question to be placed on the ballot for consideration in the November election. Pub. L. No. 113-2010, § 185, 2010 Ind. Acts 1342, 1553-54. The amendment was ratified by a majority of the voting electorate during the 2010 general election by a vote of 72% to 28%. 2010 Hist. Election Results - Referendums, Ind. Sec'y State (2010).[13] Since their adoption, the constitutional tax caps have not been amended, and there has been only one minor amendment to the statutory caps, which is unrelated to the provisions at issue in this case. Pub. L. No. 205-2013, § 77, 2013 Ind. Acts 2141, 2477-

---

[12] Action List: H.J. Res. 1 of the 2008 Sess., 115th Gen. Assemb. Archives, available at https://archive.iga.in.gov/2008/bills/billinfo7781.html?year=2008&request=getActions&doctype=HJR&docno=0001 (last visited July 19, 2024).

[13] 2010 Hist. Election Results - Referendums, Ind. Sec'y State (2010), available at https://www.indianavoters.in.gov/ENRHistorical/ElectionResults?year=2010 (last visited July 19, 2024).

78.

## B. The Constitution's text does not contain a one-acre limitation

Turning to the text of Article 10, Section 1, the Court must examine the constitutionally prescribed one percent cap and determine whether it permits a one-acre limitation like the one imposed by the statutory cap. The Constitution provides that the one-percent cap applies to "property described in subsection (c)(4)," which is "[t]angible property, including curtilage, used as a principal place of residence[.]" IND. CONST. art. 10, § 1(c)(4), (f)(1). The statutory cap does not use the constitutional language but instead applies the one percent cap to "homestead" property "that has been granted a standard deduction under IC 6-1.1-12-37." *See* IND. CODE § 6-1.1-20.6-2(a) (2019); I.C. § 6-1.1-20.6-7.5(a)(1). Under the statute, a "homestead" is defined, in relevant part, as "an individual's principal place of residence . . . that consists of a dwelling and the real estate, *not exceeding one (1) acre*, that immediately surrounds that dwelling." I.C. § 6-1.1-12-37(a)(2) (emphasis added). Land in excess of the one-acre limitation is assigned to the two or three percent cap, depending on the type of property. I.C. § 6-1.1-20.6-7.5(a)(2)-(5).

On its face, the one percent cap established by Article 10, Section 1 does not contain any direct reference to the term "homestead" or any express limitations on the size or acreage of the property entitled to its benefit. *See* IND. CONST. art. 10, § 1(f)(1). Consequently, the Court must examine the meaning of the words used to describe the class of property entitled to the cap to determine whether they imply a size or acreage limitation. This requires consideration of three distinct terms: "tangible property," "principal place of residence," and "curtilage."

16

Neither party contends that the terms "tangible property" or "principal place of residence" impose a size or acreage limitation. "Tangible property" refers to "[p]roperty that has physical form and characteristics." BLACK'S LAW DICTIONARY 1254 (8th ed. 2004). It stands in contrast to intangible property which is "[p]roperty that lacks a physical existence[,]" such as stock options or business goodwill. *Id.* at 1253. Tangible property is limited only by its ability to be perceived by the senses without any reference to fixed limitations on the size or acreage of the property. *See id.*; WEBSTER'S THIRD NEW INT'L DICTIONARY 2337 (2002 ed.) (defining "tangible property" as "property (as real estate) having physical substance apparent to the senses").

Likewise, the phrase "principal place of residence" is similarly unbounded by any fixed limitations on size or acreage. Though no court has had occasion to define it for purposes of Article 10, Section 1, the Court need not settle the precise boundaries of the constitutional meaning in this case. It is enough that the ordinary meaning of the words comprising the phrase do not, separately or in conjunction, impose any fixed limitations on the size or acreage of land. *See, e.g.*, WEBSTER'S THIRD NEW INT'L DICTIONARY at 1802 (defining "principal" as the "most important, consequential, or influential: relegating comparable matters, items, or individuals to secondary rank"), 1727 (defining "place" as a "physical environment: SPACE"), 1931 (defining "residence" as "the place where one actually lives or has his home as distinguished from his technical domicile"). That the term "principal place of residence" does not contain any fixed limitations on the size or acreage of the land to which it may apply, however, is not to say that the size or acreage of the land is never a factor in the inquiry. Limitations on size or acreage may arise from use and will depend on the facts and circumstances of

17

each individual case, particularly a taxpayer's ability to show that the taxpayer uses a particular piece of property as part of the taxpayer's "principal place of residence." Such limits are likely to vary depending on the person and the property.

Lastly, the precise definition of the word "curtilage" varies in several respects depending on the source. *See State v. Bonano*, 284 A.2d 345, 347 (N.J. 1971) (noting that "'[c]urtilage' is not a term that can in all cases be precisely defined"). It is not necessary for the Court to ascertain a precise definition of "curtilage" in this case, however, as all of the sources are consistent in defining the term without reference to fixed size or acreage limitations. Some sources define "curtilage" as the land surrounding a house or dwelling and enclosed within a fence. *See, e.g.*, WEBSTER'S THIRD NEW INT'L DICTIONARY at 558 (defining "curtilage" as "a yard, courtyard, or other piece of ground included within a fence surrounding a dwelling house"). Some define "curtilage" as the land surrounding a house or dwelling, but do not require the land to be enclosed within a fence. *See, e.g.,* BLACK'S LAW DICTIONARY at 411-12 (defining "curtilage" as "[t]he land or yard adjoining a house, usu[ally] within an enclosure"). Others define "curtilage" by reference to the use to which the land is put in the absence of an enclosure or fence. *See, e.g.,* MELLINKOFF'S DICTIONARY OF AMERICAN LEGAL USAGE 145 (1992) (defining "curtilage" as "the area around a house that includes grounds, outbuildings, and fencing intimately associated with domestic life in the house" and noting that it "has no standard limits as to square footage or size or nature of what is put in the ground"); *Jones v. Holloway*, 36 A.2d 551, 553 (Md. 1944) (defining "curtilage" as "any adjacent land which was used . . . in connection with [the house] and which is necessary for its reasonable use and enjoyment") (citation omitted); *Hays v. Paramus*

18

*Borough*, 28 N.J. Tax 342, 352-53 (N.J. Tax Ct. 2015) (citing *McTague v. Monroe Twp.*, 1 N.J. Tax 66, 71-72 (N.J. Tax Ct. 1980)) (defining "curtilage" as requiring "a natural and necessary connection between the dwelling house and the amount of land claimed" and confining the space "to that portion of the land which has a reasonable relationship to the dwelling house and which is reasonably required . . . for the occupation and full enjoyment of the dwelling"). Still others define "curtilage" as requiring both an enclosure and a use supporting the house or dwelling. *See, e.g.,* 8 A.L.R. 673 (citing *People ex rel. Murphy v. Gedney*, 10 Hun 151 (N.Y. 1877)) (holding that "curtilage" included "the courtyard in the front or rear of a house or at its side, or any piece of ground lying near, inclosed [sic] and used with the house and necessary for the convenient occupation of the house").[14]

As noted, the Court need not reconcile the differences between the varying definitions of "curtilage" to resolve the question in this case. It is enough that none of the definitions identified by this Court reference fixed size or acreage limitations as a factor. The inquiry depends entirely on other factors, including the presence of a fence or enclosure and, in some formulations, the use of the property itself. For definitions that require an enclosure or fence, the inquiry is simply whether the land adjoining the house is enclosed or fenced. For definitions that consider the use of the property, the inquiry focuses on the use of the land or its connection to the use of the house. Like "principal

---

[14] While search and seizure law and property tax law are distinct in their legal frameworks and objectives, the definition of "curtilage" used in search and seizure inquiries under the Fourth Amendment to the United States Constitution does not contain any express size or acreage limitations. *See United States v. Dunn*, 480 U.S. 294, 301 (1987) (defining "curtilage" with reference to four factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by") (citations omitted).

place of residence," the size or acreage of the land may be a factor in evaluating use (or enclosure), but it does not admit fixed size or acreage limitations.

The Court is unable to identify any foothold for the statutory one-acre limitation in the text of the Constitution after examining each of the relevant terms used to delineate the class of property entitled to the one percent cap (i.e., "tangible property," "principal place of residence," and "curtilage"). The Court must be "mindful of both what [the text] does say and what it does not say." *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016) (citation and internal quotation marks omitted). It is apparent that the constitutional one percent cap does not contain any express limitation on the size or acreage of land. Nor does it imply such limitations. Therefore, for purposes of the Constitution, the amount of land that may be entitled to the one percent cap may be less than, more than, or exactly one acre.[15] The inquiry necessarily depends on factors other than the size or acreage of the land in question.[16]

---

[15] Courts have regularly determined that the curtilage of a building is more than one acre. *See, e.g.*, *Bullis Sch., Inc. v. Appeal Tax Ct. for Montgomery Cnty.*, 114 A.2d 41, 42 (Md. 1955) (acknowledging property tax exemption extended to 34 acres of a 285-acre farm, which included all farm buildings and curtilage, due to its use for educational purposes); *Carlisle v. Carlisle's Estate*, 252 So.2d 894, 895-96 (Miss. 1971) (interpreting "home" in testatrix's bequest of "one-half value" to mean half of the entire 58.4 acre estate, not "only the house, outbuildings, and a curtilage of two acres" due to her unrestricted use and enjoyment of all the unfenced land); *McTague v. Monroe Twp.*, 1 N.J. Tax 66, 71-72 (N.J. Tax Ct. 1980) (exempting two acres of a 40-acre parcel as curtilage, finding they had a "reasonable relationship to the dwelling house" and were "reasonably required by the disabled veteran for the occupation and full enjoyment of the dwelling"); *Solebury Twp. Bd. of Supervisors v. Bucks Cnty. Bd. of Assessment & Revision of Taxes*, 1966 WL 226518, at *1-2 (Pa. Commw. Ct. Pl. Aug. 29, 1966) (concluding that 25 acres of a 71.68-acre parcel constituted "a reasonable curtilage" of the three exempt buildings, as both the land and all the other buildings thereon were "accessory" to the religious uses of the exempt buildings).

[16] The parties have focused their advocacy on the word "curtilage," assuming that it resolves the constitutional question. However, even if the Court were to determine that "curtilage" requires a one-acre limitation, it would not end the constitutional analysis in this case. There remains a thornier interpretive issue regarding the meaning of the phrase "[t]angible property, including

## C. The structure of the constitutional two and three percent tax caps aligns with the text of the constitutional one percent tax cap

The structure of the other constitutional tax caps supports the conclusion that the text of the one percent cap does not contain any fixed size or acreage limitations. Within the three separate tax caps (i.e., 1%, 2%, and 3%) set forth in Article 10, Section 1, the Constitution defines five different classes of property to which those caps apply. *See* IND. CONST. art. 10, § 1(f). The one percent cap applies only to "tangible property described in subsection (c)(4)[.]" *Id.* at § 1(f)(1). The two percent cap applies to "other residential property" and "agricultural land[.]" *Id.* at § 1(f)(2)-(3). And the three percent cap applies to "other real property" and non-residential personal property. *Id.* at § 1(f)(4)-(5).

Each class of property assigned to the two and three percent caps is expressly defined by the use of the property and does not contain fixed size or acreage limitations. Two of the property classes ("other residential property" and "agricultural land") are expressly defined by their use. *Id.* at § 1(e)(1) (defining "other residential property" as property "used for residential purposes" and not otherwise eligible for the one percent cap), (e)(2) (defining "agricultural land" as "land devoted to agricultural use"). The other two categories ("other real property" and non-residential personal property) are defined

---

curtilage." In particular, the effect of the phrase "including curtilage" on the scope of the principal term "[t]angible property." It is well established that the word "including" has multiple meanings: it can be a term of limitation, a term of illustration, or a term of enlargement. *See* BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE 586 (5th ed. 2022) (noting that the word "include" "has traditionally introduced a non-exhaustive list but is now coming to be widely misused for *consists of*"); BLACK'S LAW DICTIONARY 777-78 (8th ed. 2004) (explaining that "[t]he participle *including* typically indicates a partial list"); *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (noting that "the term 'including' is not one of all-embracing definition, but [may] connote[] simply an illustrative application of the general principle") (citations omitted).

by exclusion, by how they are *not* used. *See id.* §§ 1(e)(3) (defining "other real property" as property that is used for neither agricultural nor residential purposes), (f)(5) (defining non-residential personal property as personal property that is not used for residential purposes). The one percent cap mirrors these other four property classes by defining the class of property eligible for it with reference to use as well. *See id.* at § 1(c)(4), (f)(1) (restricting the one percent cap to property "used as a principal place of residence").

The parallel structure between the five property classes delineated by the constitutional caps supports an inference that a one-acre limitation was not intended to be implied in the one class of property assigned to the one percent cap. *See Ernst & Ernst v. Underwriters Nat'l Assurance Co.*, 381 N.E.2d 897, 900 (Ind. Ct. App. 1978) (providing that courts should consider each part of a statute in relation to its entirety and give statutory words their plain and ordinary meanings when construing statutory language). Of course, a size or acreage limitation could have been included in the one percent cap, but the absence of such a provision in the other four property classes suggests that it would have been stated explicitly, had such a limitation been intended. To hide such a concrete and consequential limitation, like one restricting the size or acreage of land, within such broad and flexible language would defeat the stated goal of ensuring permanent property tax relief to homeowners.

### D. The timing of the statutory and constitutional tax cap adoptions does not indicate an intention to imply a one-acre limitation

The Assessor leans heavily on the fact that the 2008 statutory tax caps were passed in the same year that the constitutional tax caps were first crafted. She contends that the constitutional tax caps should be confined to the scope of the statutory tax caps

because both were passed in the same legislative session and because the digests of

the joint resolutions use the term "homestead property" when describing the proposed

amendment. *See* Digest of S.J. Res. 1, 115th Gen. Assemb., 2d Reg. Sess. (Ind. 2008);

Digest of H.J. Res. 1, 116th Gen. Assemb., 2d Reg. Sess. (Ind. 2010).[17] She argues

that the use of the statutory homestead definition in the statutory one percent tax cap

evinces a clear legislative intent to limit the scope of the constitutional one percent cap

in the same manner.[18]

This argument, however, is founded on a misunderstanding of the constitutional

tax caps. While the statutory and constitutional tax caps were both established during

the 2008 legislative session, the operative language defining the class of property

entitled to the one percent cap –Subsection (c)(4) – was part of the 2004 constitutional

amendment that expanded the General Assembly's power to exempt property from

taxation. *See* IND. CONST. art. 10, § 1(a)(4) (amended 2004). That amendment conferred

---

[17] Digest of S.J. Res. 1, 115th Gen. Assemb., 2d Reg. Sess. (Ind. 2008), available at https://archive.iga.in.gov/2008/bills/billinfo1f65.html?year=2008&session=1&request=getBill&docno=0001&doctype=SJR (last visited July 19, 2024); Digest of H.J. Res. 1, 116th Gen. Assemb., 2d Reg. Sess. (Ind. 2010), available at https://archive.iga.in.gov/2010/bills/billinfoa5bd.html?year=2010&session=1&request=getBill&docno=0001&doctype=HJR (last visited July 19, 2024).

[18] The Assessor's written brief cites various house bills, public laws, joint resolutions, and other related source materials to support her arguments. The Sawlanis contend that these documents should not be considered by the Court because they were not admitted into evidence during the Indiana Board hearing. However, it is within the Court's purview to take judicial notice of various laws, including the decisional, constitutional, and public statutory laws of this state, at any stage of the proceedings. *See, e.g.*, Ind. Evidence Rule 201(b)(1), -(d); *Stubbs v. State*, 560 N.E.2d 528, 532 (Ind. 1990) (taking judicial notice of Indiana's statutory laws); *Roeschlein v. Thomas*, 280 N.E.2d 581, 584 (Ind. 1972) (taking judicial notice of legislative enactments leading toward a constitutional amendment); *In re Holovachka*, 198 N.E.2d 381, 389 (Ind. 1964) (taking judicial notice of a law regarding a prosecuting attorney's salary before the law was amended). *See also, e.g.*, *In re Denny*, 59 N.E. 359, 361 (Ind. 1901), *overruled on other grounds by In re Todd*, 193 N.E. 865 (Ind. 1935) (taking judicial notice of election results, as shown by the returns made to the secretary of state).

broad power upon the Legislature to enact statutes exempting "[t]angible real property, including curtilage, used as a principal place of residence by an . . . owner of the property" from taxation, allowing it to specify the conditions and extent of such exemptions. *See id.* It was first crafted in 2002 and ratified by the voters in 2004, well before the constitutional tax caps were proposed. *See* Pub. L. No. 189-2002; 2004 Hist. Election Results - Referendums.

The history surrounding the 2004 constitutional amendment is limited, but there is no indication that its scope was intended to be confined in any way to the statutory homestead definition or that any fixed size or acreage limitations were intended. The history suggests, at most, a lingering uncertainty about the statutory property tax system and a desire to mitigate any latent constitutional infirmity relating to homeowner protections through the amendment. The only change that has been made to the operative language since its adoption in 2004 is the deletion of the word "real" as part of the 2010 amendment. *See* Pub. L. No. 147-2008, 2008 Ind. Acts 3118, 3118-20. That change, however, only served to expand the language to cover both real and personal property. *See id*. No changes have been made that would narrow the scope of the operative language or confine it to fixed size or acreage limitations. The meaning of that operative language in Subsection (c)(4), then, was fixed by 2004, at the latest, when it was ratified by the voters.

There is significant tension between the simultaneous use of Subsection (c)(4) for two different provisions. If Subsection (c)(4) were narrowly interpreted in response to the 2010 amendment by limiting it to homestead property and one acre, as the Assessor urges, it would have the effect of simultaneously curtailing the breadth of the

24

2004 amendment, thereby constraining the General Assembly's power to exempt real property from taxation under Article 10. The 2004 amendment uses the operative language to place a ceiling on the extent of the Legislature's power to exempt certain residential property from taxation. But the 2010 amendment uses the same operative language to establish a minimum floor on the type of property entitled to the one percent tax cap. Each of these provisions pulls in a different direction such that the scope of one directly impacts the scope of the other. It is settled that courts should interpret different sections of an act harmoniously to give effect to the legislative intent expressed in the whole act. *See AlliedSignal, Inc. v. Ott*, 785 N.E.2d 1068, 1078-79 (Ind. 2003) (Dickson, J., dissenting). Because the text of the 2010 amendment gives no indication that it was intended to narrow the 2004 amendment, this Court cannot presume that the Legislature intended to narrow the meaning of the 2004 amendment by implication, and therefore Subsection (c)(4), to include only homestead property and one acre of land through a subsequent amendment several years later. To do otherwise risks substantially limiting the General Assembly's power to craft property tax relief under Subsection (c)(4).

The Assessor further contends that the digests of the joint resolutions describing the scope of the constitutional one percent cap confirm an intent to limit the constitutional cap to "homestead property." This argument is flawed. The digest is not the product of the legislative process but merely a summary of the legislation provided by the staff of the Legislative Services Agency. *See, e.g.*, OFF. OF CODE REVISION LEGIS. SERVS. AGENCY, DRAFTING MANUAL FOR THE INDIANA GENERAL ASSEMBLY, 41-43, 106-09

(2012).[19] Nothing in the text of the amendment reflects the digests' use of "homestead." *See* Pub. L. No. 147-2008. Any intent the digests may reflect cannot overcome the clear conflict with the original meaning of Subsection (c)(4) established when it was adopted as part of the 2004 amendment. Nor can it be reconciled with the lack of any subsequent modifications to the text of Subsection (c)(4) that would impose fixed size or acreage limitations. *See Rogers v. Calumet Nat'l Bank of Hammond*, 12 N.E.2d 261, 264-65 (Ind. 1938); *Brighton v. Schoffstall*, 401 N.E.2d 84, 86 (Ind. Ct. App. 1980) (indicating that courts are prohibited from expanding or contracting the plain meaning of a statute by either reading into it language to correct supposed omissions or defects or substituting language it feels the Legislature may have intended). Accepting the Assessor's argument would accord the digests more weight than they are due and improperly elevate each digest to the status of a constitutional amendment, contrary to Article 16. *See, e.g., McNeil v. Anonymous Hosp.*, 219 N.E.3d 789, 800 n.2 (Ind. Ct. App. 2023) (providing that synopses and digests are not a part of enacted bills).

### E. The public question does not change the meaning of the text

The Assessor also points to the language of the ballot question placed before the voters in 2010, which stated:

Public Question #1

SHALL PROPERTY TAXES BE LIMITED FOR ALL CLASSES OF PROPERTY by amending the Constitution of the State of Indiana to do the following:

(1) Limit a taxpayer's annual property tax bill to the following

---

[19] OFF. OF CODE REVISION LEGIS. SERVS. AGENCY, DRAFTING MANUAL FOR THE INDIANA GENERAL ASSEMBLY, 41-43, 106-09 (2012), available at https://iga.in.gov/publications/bill_drafting_manual/2022-12-12T19-42-34.089Z-DRAFTING_MANUAL.pdf (last visited July 19, 2024).

percentages of gross assessed value:

    (A) 1% for an owner-occupied primary residence (*homestead*);

    (B) 2% for residential property, other than an owner-occupied primary residence, including apartments;

    (C) 2% for agricultural land;

    (D) 3% for other real property; and

    (E) 3% for personal property.

The above percentages exclude any property taxes imposed after being approved by the voters in a referendum.

(2) Specify that the General Assembly may grant a property tax exemption in the form of a deduction or credit and exempt a mobile home used as a primary residence to the same extent as real property?

Pub. L. 113-2010, § 185, 2010 Ind. Acts. 1342, 1553-54 (emphasis added). The Assessor asserts that the inclusion of the term "homestead" in the ballot question conclusively demonstrates that the one percent tax cap was intended to extend only as far as the statutory definition of "homestead."

This reading conflates the ordinary everyday meaning of the term "homestead" with its statutory definition. When interpreting the Constitution, "[courts] look to the understanding of the ratifiers." *McIntosh v. Melroe Co., a Div. of Clark Equip. Co.*, 729 N.E.2d 972, 983 (Ind. 2000) (citations omitted). While the statutory definition of "homestead" includes a one-acre limitation, the ordinary meaning of the word "homestead" does not. *Compare* I.C. § 6-1.1-12-37(a)(2) (defining "homestead" as "a dwelling and the real estate, not exceeding one (1) acre, that immediately surrounds that dwelling") *with* WEBSTER'S THIRD NEW INT'L DICTIONARY at 1083 (defining a homestead as "the home and land of a family"). Here, there is nothing to indicate that the ratifiers would have understood the reference to "homestead" in the ballot question

27

as a reference to the statutory definition of "homestead." The language of the ballot question neither points directly to the statutory definition nor signifies that the word "homestead" should be understood in any way other than according to its ordinary meaning. The Court finds it more likely that the ratifiers would have understood the reference to "homestead" in the ballot question according to its everyday usage, not its technical or legal sense.

Aside from how the ratifiers may have understood the term "homestead," allowing the ballot question to add to or limit the words of the amendment itself would contravene the constitutional amendment process in Article 16, Section 1. This process requires ratification by voters after agreement by two different General Assemblies separated by an intervening general election. IND. CONST. art. 16, § 1. The ballot question is adopted like ordinary legislation using a bill passed by only one General Assembly. *See* IND. CODE §§ 3-10-3-1 to -9 (2010) (amended 2011). It cannot modify constitutional language or redefine "homestead" beyond the scope of the constitutional amendment approved by voters. *See* IND. CONST. art. 16, § 1.

The bill establishing the ballot question was crafted and passed by the 2010 General Assembly – two years after the language of the 2010 amendment was crafted. *See* Pub. L. No. 147-2008; Pub. L. No. 113-2010, § 185. Giving the public question controlling effect would elevate that legislation to the level of constitutional amendment in contravention of Article 16, Section 1, even though Article 16 does not permit one General Assembly to unilaterally change the language of a constitutional amendment without the consent of a second. *See* IND. CONST. art. 16, § 1. For that reason, courts focus on the actual language of the constitutional amendment itself "because it tells us

28

how the voters who approved the Constitution understood it, whatever the expressed intent of the framers in debates or other clues." *McIntosh*, 729 N.E.2d at 983. The language of the amendment itself, as approved by the voters, holds legal force, not the ballot language. *See, e.g.*, *Holcomb*, 187 N.E.3d at 1280-83 (concluding that the length-and-frequency clause of Article 4, Section 9 does not limit the legislature to one regular session per year despite ballot language describing the amendment as "permit[ting] the General Assembly to meet annually instead of biennially").

### F. The one-acre limitation is unconstitutional as-applied to some taxpayers

The Constitution's text is unambiguous regarding the narrow question presented in this case. Article 10, Section 1 requires the one percent cap to be applied to "[t]angible property, including curtilage, used as a principal place of residence" of an eligible taxpayer. IND. CONST. art. 10, § 1(c)(4), (f)(1). Subsection (c)(4), which delineates the class of property entitled to the one percent cap, contains no fixed size or acreage limitations. That provision was adopted in 2004 as part of a different constitutional amendment to Article 10, Section 1. It therefore acquired its meaning in 2004 when adopted and has not been narrowed since that time to include any limitations. Limitations on the size or acreage of land may arise from the land's use as the taxpayer's "principal place of residence," but these limitations are not fixed and necessarily vary based on the circumstances of each particular case. While the simultaneous adoption of related statutory and constitutional frameworks might ordinarily suggest congruence, the clarity of the constitutional text and the use of the text from the 2004 amendment overwhelm any notion of a contrary intent.

Consequently, fixed size and acreage limitations, like the statutory one-acre limit

29

in the homestead definition, are incompatible with the Constitution. The statutory framework implementing the constitutional one percent cap limits the cap to no more than one acre of land surrounding a dwelling and allocates land in excess of one acre to the other caps. *See* I.C. § 6-1.1-20.6-7.5(a)(1)-(5). This is less than the Constitution requires and fails to fulfill the constitutional mandate contained in Article 10, Section 1. The constitutional tax caps establish strict limitations on the state's ability to tax property, setting a ceiling on the amount of tax that can be levied and a floor on the type of property entitled to the benefit of each cap. The Constitution does not grant the Legislature the discretion to narrow a class of property constitutionally allocated to a specific tax cap.

In the case at hand, the Sawlanis have challenged only the one-acre limitation imposed by the statutory one percent cap, without contesting any other aspect of the statutory framework's consistency with the constitutional framework. They implicitly acknowledge that, absent the one-acre limitation, the statute would be constitutionally applied to their property. (*See* Pet'rs' Reply Br. at 7.) The one-acre limitation, as defined in the statutory one percent cap under Indiana Code section 6-1.1-20.6-7.5(a)(1), is not unconstitutional on its face because it can be constitutionally applied in some circumstances. *See Meredith*, 984 N.E.2d at 1218 (indicating that a statute is unconstitutional on its face when there is no set of circumstances under which it can be constitutionally applied). However, as applied to taxpayers like the Sawlanis with more than one acre of land, the constitutionality of the one-acre limitation's application will vary depending on the specific circumstances of each case.

Applying this principle, for taxpayers with less than one acre of land, the one-acre

30

limitation poses no constitutional issue. However, for those with more than one acre, the statutory one percent cap may be unconstitutional as applied to them if the taxpayer establishes that land exceeding one acre, or some portion thereof, would otherwise satisfy the definition of property eligible for the one percent cap as specified in Indiana Code section 6-1.1-20.6-2. The statute applies the one percent cap to a person's "homestead," which is defined as "a homestead that has been granted a standard deduction under IC 6-1.1-12-37." I.C. § 6-1.1-20.6-2(a). Therefore, where land fails to qualify for the standard deduction solely because it exceeds the one-acre limitation, the property may be evaluated through the existing appeal process to determine whether it would otherwise be eligible for the deduction without the one-acre limitation. This approach allows for a case-by-case evaluation of the one-acre limitation's constitutionality as applied to taxpayers with properties exceeding one acre, while maintaining the statutory framework's facial constitutionality.

The Indiana Board did not make sufficient factual findings to enable the Court to determine whether Indiana Code section 6-1.1-20.6-7.5(a)(1) is unconstitutional as applied to the Sawlanis. Given these circumstances, this matter is remanded to the Indiana Board for further proceedings to determine whether the Sawlanis' additional 2.981 acres of land qualifies for the one percent cap absent the statutory one-acre limitation. On remand, the inquiry need not examine whether the taxpayers' initial acre of land is eligible for the one percent tax cap. Rather, the focus should be on the use of the disputed 2.981 acres, specifically examining whether this acreage is used as part of the Sawlanis' principal place of residence, consistent with the statutory and constitutional frameworks. *See* IND. CONST. art. 10, § 1(c)(4), (f)(1); I.C. §§ 6-1.1-20.6-

31

7.5(a)(1), -12-37. The Indiana Board may take any actions it deems necessary to resolve the case effectively, including conducting a new evidentiary hearing to ascertain the nature and purpose of the disputed acreage in relation to the Sawlanis' principal place of residence.

## CONCLUSION

The Sawlanis have demonstrated that the statutory one percent tax cap may be unconstitutional as applied to them. The resolution of this constitutional challenge depends on whether any portion of their contested acreage would qualify for the standard deduction under Indiana Code section 6-1.1-12-37 but for the one-acre limitation. Accordingly, the Court REVERSES the Indiana Board's determination that the Sawlanis were not entitled to the one percent tax cap credit on the contested acreage during the 2019 tax year and REMANDS the matter to the Indiana Board for further proceedings consistent with this opinion.